Filed 8/7/23

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| GENE MORAN,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>PRIME HEALTHCARE<br>MANAGEMENT, INC., et al.,<br><br>    Defendants and Respondents. | G060920<br><br>(Super. Ct. No. 30-2013-00689394)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Glenda Sanders, Judge.  Affirmed.  Request for judicial notice granted.

Carpenter Law, Gretchen Carpenter; Law Office of Barry Kramer and Barry L. Kramer for Plaintiff and Appellant.

Miller Barondess, Mira Hashmall and Adam M. Agatston for Defendants and Respondents.

\*        \*        \*

This is the second appeal in this putative class action regarding hospital fees and costs for patients not covered by insurance. Plaintiff Gene Moran, who was a patient at Huntington Beach Hospital (the Hospital) three times in 2013, sued defendants Prime Healthcare Management, Inc., Prime Healthcare Huntington Beach, LLC, Prime Healthcare Services, Inc., and Prime Healthcare Foundation, Inc. (collectively defendants)[1] under various theories in 2013. In our prior opinion, we found that while most of Moran's claims lacked merit, he had sufficiently alleged facts supporting standing to claim the amount that self-pay patients were charged was unconscionable, and we reversed the trial court's dismissal of the case. (*Moran v. Prime Healthcare Management, Inc.* (2016) 3 Cal.App.5th 1131, 1137 (*Moran*).)

Moran's sixth amended complaint included both the allegations regarding unconscionability and a new theory of the case. The new allegations asserted defendants had violated the Unfair Competition Law (UCL; Bus. & Prof. Code, § 17200), and the Consumer Legal Remedies Act (CLRA; Civ. Code, § 1750 et seq.) by failing to disclose Evaluation and Management (EMS) fees charged in the emergency room through signage or other methods. The complaint sought relief under both the old and new theories for violations of the UCL, CLRA, and for declaratory relief (Code Civ. Proc., § 1060).

Defendants moved to strike the allegations regarding EMS fees, arguing their disclosure obligations were defined by statute. The trial court agreed and struck the allegations from the sixth amended complaint.

We conclude that the trial court's order striking the EMS fee allegations was proper. The duties Moran seeks to impose on defendants interfere with the extensive

---

[1] According to the sixth amended complaint, "Defendants Prime Healthcare Services, Inc., and/or Prime Healthcare Services Foundation, Inc., together own and/or operate one or more medical care facilities throughout California, including Huntington Beach Hospital, and that Defendant Prime Healthcare Management, Inc. provides management and billing services for these Hospitals."

2

and carefully drawn state and federal legislative and regulatory scheme governing the disclosure and transparency of hospital prices. Accordingly, we affirm the order.

I

FACTS

*Background*

As our prior opinion stated, "On three occasions in October 2013, plaintiff, 'a self-pay patient,' went to the emergency room of a hospital owned and operated by defendants . . . . Each time, he signed a printed Conditions of Admission agreement (Contract) and received medical treatment. Subsequently, plaintiff received bills from the hospital for the treatment provided during the three visits that exceeded $10,000.

"In November 2013, plaintiff filed this putative class action against defendants. The initial complaint stated causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, violation of the UCL, restitutionary relief under the CLRA, and declaratory relief. Plaintiff subsequently dropped the first and second counts. His first amended complaint also expanded the scope of the CLRA cause of action to include a request for damages by alleging that he complied with the statutory requirement of giving defendants notice of the purportedly unlawful practice and a demand for correction of it. Although verbose, confusing, containing contradictory allegations, and contentions of law, each iteration of the complaint is based on allegations the rates defendants charge self-pay patients are discriminatory, exceed the reasonable value of the treatment, and are 'artificially inflated and grossly excessive.'" (*Moran*, *supra*, 3 Cal.App.5th at pp. 1137-1138.) In July 2014, the Hospital sent a letter to Moran stating that following an administrative review, his accounts had been settled and he had a zero balance. The Hospital also contacted the credit reporting agencies to inform them that any information regarding the Hospital should be removed, and issued Moran a partial refund of $50 for one of his visits. (*Id.* at p. 1137, fn. 1.)

3

Defendants demurred to the third amended complaint, which the trial court sustained without leave to amend. (*Moran*, *supra*, 3 Cal.App.5th at p. 1138.) We found that while Moran had standing and had sufficiently alleged the Contract was unconscionable, the remainder of his other claims were invalid. (See *id.* at pp. 1141-1153.)

After remand, Moran filed a fourth and eventually a fifth amended complaint. The fifth amended complaint alleged representative claims with respect to the UCL and CLRA causes of action, and a class claim as to the declaratory relief cause of action. His list of common questions of law and fact in the declaratory relief cause of action related to the reasonableness and/or unconscionability of the rates charged despite contractual language promising to pay. Around the same time, however, a number of trial courts had declined to certify classes based on the same theory, and Division One of this District had affirmed the denials. (See, e.g., *Hefczyc v. Rady Children's Hosp.-San Diego* (2017) 17 Cal.App.5th 518, disapproved of in part by *Noel v. Thrifty Payless, Inc.* (2019) 7 Cal.5th 955, 986, fn. 15; *Kendall v. Scripps Health* (2017) 16 Cal.App.5th 553, disapproved of in part by *Noel*, at p. 986, fn. 15.)[2]

Following these decisions, Moran later moved to certify a class on a different basis. His proposed "issue" class was based on the question of whether the Hospital had a duty to disclose EMS fees, a subject which had not been raised in any of his six prior complaints. The court noted, in denying the motion for class certification, that this class was "quite different from that alleged in [Moran's] Fifth Amended

---

[2] In *Noel v. Thrifty Payless, Inc.*, *supra*, 7 Cal.5th at pages 985-986, the California Supreme Court disapproved a line of cases which had reasoned that a proposed class must be ascertainable without unreasonable expense or time. In addition to finding the class was not ascertainable, the court in *Hefczyc v. Rady Children's Hosp.-San Diego*, *supra*, 17 Cal.App.5th at pages 540-545, also found that common issues did not predominate and that class treatment was not superior to other forms of litigation. In *Kendall v. Scripps Health*, *supra*, 16 Cal.App.5th at pages 564-574, the court had also found that common issues did not predominate.

Complaint." The court ultimately denied the motion to certify the class and granted leave to file a sixth amended complaint, which is the operative complaint before us.

*Sixth Amended Complaint*

In the sixth amended complaint, filed on March 8, 2021,[3] Moran stated he challenged "two specific practices of Defendants. First, on a classwide basis, Plaintiff challenges Defendants' unfair, deceptive, and unlawful practice of charging emergency room patients an 'Evaluation and Management Services Fee' or 'EMS Fee,' without any notification of their intention to charge a prospective emergency room patient such a Fee for the patient's emergency room visit . . . and without any agreement by Plaintiff to pay for such a Fee." This is the claim, new to the sixth amended complaint,[4] that is at issue in this appeal.

Under general allegations concerning the EMS fee, Moran alleged that charging this fee "without any notification of their intention to charge a prospective emergency room patient such a Fee for the patient's emergency room visit" was an "unfair, deceptive, and unlawful practice." The issue, according to the complaint, "is not that Defendants fail to list an EMS Fee as a line item in the Hospital's published Chargemaster,[[5]] or that Defendants fail to list the price of such EMS Fees in the

---

[3] The original complaint was filed on November 25, 2013. This case has been pending for over nine years without moving beyond the pleading stage.

[4] From this point forward, we refer to the sixth amended complaint as "the complaint" unless it is necessary to distinguish it from an earlier version.

[5] "The chargemaster lists the uniform charge for given services represented by the hospital as its gross billed charge for a given service or item, regardless of payer type, and sets forth every hospital charge for every type of service, including emergency room services." (*Gray v. Dignity Health* (2021) 70 Cal.App.5th 225, 230 (*Gray*).) The complaint alleged, on information and belief, that the Hospital "does not make its Chargemaster spreadsheet reasonably available to emergency room patients at the time of their emergency room visits."

5

Hospital's Chargemaster, but rather the fact that Defendants give no notification or warning that they charge an EMS Fee for an emergency room visit. As a result, emergency room patients end up being surprised by a substantial charge added to their bill that they were not expecting. Such charges are effectively hidden by Defendants' intentional failure to provide notice of them in the emergency room."

Further, the complaint alleged that the EMS fee is charged "simply for seeking treatment in the emergency room; it is independent of, and in addition to, the charges for the individual items of treatment and services provided to a patient. Rather than being tied to the individual items of treatment and services a patient receives in the emergency room, an EMS Fee is charged to all patients who receive treatment in the emergency room, regardless of what other services and treatment they receive. This Evaluation and Management Services Fee invariably comes as a complete surprise to unsuspecting emergency room patients." The EMS fee, Moran alleged, is charged at one of five levels.

Defendants, Moran alleged, keep this fee "effectively hidden from patients who might otherwise look for less costly medical treatment and services elsewhere, such as in urgent care facilities that do not charge such fees, or even forego treatment altogether." The EMS fee "is not visibly posted on signage in or around Hospital's emergency rooms or on signage at its registration windows/desks, where a patient would at least have the opportunity of knowing of its existence, nor is it disclosed to patients orally at the time of registration, or by any other means." Nor, the complaint alleged, is the EMS fee disclosed in writing, either before admission or at the time of discharge. The complaint alleged the chargemaster did not list the EMS fee as being charged to all emergency room patients, although the chargemasters themselves reveal EMS fees for levels two through four are listed under the 25 most common procedures, with language such as "Emergency Room Visit, Level 2 (low to moderate severity)" in both the 2012

6

and 2020 chargemasters. [6]  With respect to his own claim, Moran alleged he was charged a total of $3,568.80 in EMS fees over three visits.  In sum, the failure to disclose the EMS fee, the complaint alleged, violated the UCL, CLRA, and was subject to declaratory relief.

Defendants moved to strike the EMS fee claims, arguing that no duty to disclose EMS fees existed outside the context of the requirements set forth in the relevant provisions of the Health and Safety Code. [7]  Moran opposed.  The court issued a tentative ruling stating that the Hospital had established compliance with the relevant provisions of state law.  Citing *Nolte v. Cedars-Sinai Medical Center* (2015) 236 Cal.App.4th 1401 (*Nolte*), the court held that such compliance satisfied the requirements of the UCL.  As to the CLRA, the tentative stated that the allegations regarding lack of notice did not fall within the relevant provisions of the statute.  The tentative also struck the declaratory judgment allegations.

After a hearing and supplemental briefing, the trial court issued its ruling granting the Hospital's motion to strike.  This appeal followed.

---

[6] The court took judicial notice of the chargemasters, a ruling that Moran does not contest on appeal.  EMS fees have the requisite codes, often referred to as billing codes, but technically called "Current Procedural Terminology" or CPT codes, promulgated by the American Medical Association.  Federal regulations for Medicare-participating hospitals require hospitals to bill emergency room visits for Medicare using the five-tiered system for EMS fees.  (See 72 Fed.Reg. 66580-01 (Nov. 27, 2007); 80 Fed.Reg. 70298-01, 70448 (Nov. 13, 2015).)  Accordingly, the amount of an EMS fee changes with the severity of a patient's condition and the resources required to evaluate and manage their care.  (See *Ibid*.)

[7] Subsequent statutory references are to the Health and Safety Code unless otherwise indicated.

II

DISCUSSION

Both parties agree that this case is appealable under the "death knell"
doctrine relating to putative class actions. (*In re Baycol Cases I & II* (2011) 51 Cal.4th
751, 757-759.) We agree that exercising appellate jurisdiction is appropriate in this case.

*A. Standard of Review*

"Code of Civil Procedure section 436 permits a court on its own motion or
on motion by a party to '[s]trike out all or any part of any pleading not drawn or filed in
conformity with the laws of this state, a court rule, or an order of the court.' [Citation.]
We review an order striking all or part of a pleading generally for abuse of discretion.
[Citations.] Under that standard, we do not disturb the trial court's order unless a party
has shown a clear case of abuse as well as a miscarriage of justice. [Citations.]
'"Discretion is abused whenever, in its exercise, the court exceeds the bounds of reason,
all of the circumstances before it being considered."' [Citation.] However, to the extent
we are required to decide whether the court properly interpreted and applied governing
law in concluding a plaintiff has failed to state a cause of action, we review the matter
independently." (*Willis v. City of Carlsbad* (2020) 48 Cal.App.5th 1104, 1115.)

We agree with Moran (the defendants do not argue otherwise) that the
questions involved here are questions of law, and accordingly, our review should be the
same as would apply if this were a general demurrer. We assume the truth of "all
material facts properly pleaded, but not contentions, deductions, or conclusions of fact or
law. We also consider matters which may be judicially noticed." (*McBride v. Boughton*
(2004) 123 Cal.App.4th 379, 384-385.)

8

*B.  Propriety of a Motion to Strike*

Moran argues that "[a] motion to strike was not the proper vehicle for the relief Hospital sought." He argues that a motion for summary adjudication was the appropriate procedure. In offering this argument, Moran seeks to have it both ways – contending that we should apply de novo review and treat defendants' motion to strike as a general demurrer to the specific allegations when it suits him, and claiming that failure to state a cause of action is not an appropriate ground for a motion to strike.

To the extent we treat this case, as Moran explicitly requested, under the same standard of review as a demurrer, we find no error. Moran chose to combine his two theories of liability, unconscionability and failure to disclose the EMS fees, in a single cause of action. Accordingly, a demurrer cannot lie. (*Daniels v. Select Portfolio Servicing, Inc*. (2016) 246 Cal.App.4th 1150, 1167.)

We find this case easily falls within the purview of *PH II, Inc. v. Superior Court* (1995) 33 Cal.App.4th 1680, and its progeny, which allows a court to strike a defective portion of a cause of action. "We recognize that in some cases a portion of a cause of action will be substantively defective on the face of the complaint. Although a defendant may not demur to that portion, in such cases, the defendant should not have to suffer discovery and navigate the often dense thicket of proceedings in summary adjudication. We conclude that when a substantive defect is clear from the face of a complaint, such as . . . a purported claim of right which is legally invalid, a defendant may attack that portion of the cause of action by filing a motion to strike." (*Id*. at pp. 1682-1683.)

There is no need for an expensive motion for summary adjudication to add to what must already be the high costs of this almost 10-year-old case. The purported defects are clear from the face of the complaint, and therefore, a motion to strike was proper. Moreover, Moran claims no procedural unfairness as a result of the use of the motion to strike, such as the lack of adequate time to respond. This motion was

9

extensively litigated and carefully considered by the trial court, as reflected in its tentative rulings and orders. Sending this case back for a summary adjudication motion would only be a waste of resources for both the parties and the court.

## C. The Statutory Framework

The Payers' Bill of Rights, effective July 1, 2004, and codified at section 1339.50, et seq., was adopted to "provide patients, health plans and health care purchasers with more information about charges for hospital care. The author states that this bill will also discourage hospitals from playing games with hospital pricing in a way that gouges private payers and patients." (Assem. Com. on Health, Rep. on Assem. Bill No. 1627 (2003-2004 Reg. Sess.) as amended Apr. 24, 2003, p. 2.) "Supporters of this legislation argue that it will assist consumers in making informed choices between health providers." (*Ibid*.)

As adopted, hospitals were required to (1) "make a written or electronic copy of its charge description master available, either by posting an electronic copy of the charge description master on the hospital's Internet Web site, or by making one written or electronic copy available at the hospital location" (Assem. Bill No. 1627 (2003-2004 Reg. Sess.) as amended Sept. 2, 2003), and (2) "post a clear and conspicuous notice in its emergency department, if any, in its admissions office, and in its billing office that informs patients that the hospital's charge description master is available in the manner described in subdivision (a)." (*Ibid*.)

Early versions of the bill would have required facilities that use a chargemaster to provide written copies upon request. (Assem. Bill No. 1627 (2003-2004 Reg. Sess.) as introduced Feb. 21, 2003.) A subsequent version also required "a hospital to post a notice, as specified, that informs patients that the hospital' [chargemaster] is available on request." (Assem. Bill No. 1627 (2003-2004 Reg. Sess.) as amended Apr. 7, 2003.) These requirements were changed in the final version of the bill. Hospitals were

10

required to post their chargemasters on their web sites or to make a written or electronic copy available at the hospital itself. (§ 1339.51, subd. (a)(1).) The only signage required was "a clear and conspicuous notice in its emergency department, if any, in its admissions office, and in its billing office that informs patients that the hospital's charge description master is available" on its web site or via written or electronic copy. (§ 1339.51, subd. (c).)

The Payers' Bill of Rights included other requirements in furtherance of its goal of price transparency. As amended, hospitals were also required to file their chargemasters annually with the Office of Statewide Health Planning and Development (OSHPD), and to list their 25 most common outpatient procedures and the average prices with OSHPD, which publishes that information on its web site. (§§ 1339.55, 1339.56, subd. (a).) As noted above, the second through fourth levels EMS charges were included in the Hospital's list of 25 most common procedures for both 2012 and 2020.

Additionally, at the request of a person without insurance, hospitals must provide written estimates of expected charges, but this provision does not apply to emergency services. (§ 1339.585.) The exception for emergency care in section 1339.585 reflects a careful balancing of transparency on the one hand and not discouraging uninsured patients from seeking necessary emergency care on the other. Other provisions also reflect this concern. Hospitals are not permitted, for example, to question the patient about their ability to pay before receiving care. (§ 1317.)

Similarly, federal law applicable to hospitals participating in Medicare, under the Emergency Medical Treatment and Active Labor Act (EMTALA), prohibits delaying treatment of an emergency room patient to inquire about payment or insurance coverage. (42 U.S.C. § 1395dd(a), (h).) Federal law also requires tax-exempt hospitals to have policies that prohibit "the hospital facility from engaging in actions that discourage individuals from seeking emergency medical care, such as by demanding that

11

emergency department patients pay before receiving treatment for emergency medical conditions." (26 C.F.R. § 1.501(r)–4(c)(2).)

In the process of adopting expanded transparency regulations under the Affordable Care Act, the Center for Medicare and Medicaid Services stated that "the price transparency provisions . . . do not require that hospitals post any signage or make any statement at the emergency department regarding the cost of emergency care or any hospital policies regarding prepayment of fees or payment of co-pays and deductibles." (84 Fed.Reg. 65524, 65536 (Nov. 27, 2019).)

In sum, in the emergency room context, both state and federal lawmakers and regulators have sought a balance between transparent cost disclosure and discouraging potentially life-threatening decisions to forego emergency treatment due to its cost.


## D. Recent Appellate Decisions

To provide important context, we begin by discussing four recent opinions discussing similar or identical issues, from oldest to most newest: *Gray*, *supra*, 70 Cal.App.5th 225; *Torres v. Adventist Health System/West* (2022) 77 Cal.App.5th 500 (*Torres*); *Saini v. Sutter Health* (2022) 80 Cal.App.5th 1054 (*Saini*) and *Naranjo v. Doctors Medical Center of Modesto, Inc.* (2023) 90 Cal.App.5th 1193 (*Naranjo*) (review granted July 26, 2023, S280374.)[8] Before doing so, however, we must first discuss an older case which laid some of the groundwork for the later opinions: *Nolte*, *supra*, 236 Cal.App.4th 1401.

---

[8] The California Supreme Court granted review in *Naranjo* days after oral argument in this case. The court's order granting review stated: "Pending review, the opinion of the Court of Appeal . . . may be cited, not only for its persuasive value, but also for the limited purpose of establishing the existence of a conflict in authority that would in turn allow trial courts to exercise discretion under *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 456, to choose between sides of any such conflict."

### 1. *Nolte*

The plaintiff filed this case as a putative class action against Cedars-Sinai Medical Center (Cedars) for charging him a one-time facility fee upon seeking treatment from a doctor in a Cedars medical building for the first time.  The plaintiff had signed a "conditions of admission" (COA) form promising to pay Cedars for any services Cedars provided, but the plaintiff claimed he did not know he would be charged a facility fee of $167.01.  (*Nolte*, *supra*, 236 Cal.App.4th at pp. 1404-1405.)  The plaintiff sued under the UCL and CLRA, and for unjust enrichment, restitution, and declaratory relief.  The trial court sustained Cedars' demurrer, finding the plaintiff had obligated himself to pay the fee by signing the COA.  (*Nolte*, at p. 1405.)

The appellate court affirmed.  As to the UCL claim, the only one the plaintiff did not waive on appeal (*Nolte*, *supra*, 236 Cal.App.4th at pp. 1409-1410), the court rejected the claim that the fee was unfair and fraudulent.  The fact that the law prescribed exactly what disclosures hospitals are required to provide regarding fees and charges was key to the court's decision.  "[H]ospitals are required by law to make available a schedule of charges online or at the hospital, and to provide notice to consumers (here, patients) that they have done so in a prescribed fashion, and there is no allegation that Cedars did not do so."  (*Id.* at p. 1408.)

Further, "Cedars's agreement with Nolte's physician was that it would set up the computerized billing service for the patients.  Nolte signed the COA stating that he would pay Cedars's charges, and that he may be billed separately by his physician and by Cedars (which was prohibited by law from employing his physician).  Cedars then issued a separate bill to Nolte for creating his patient account (a function which the complaint alleges is often provided by the medical providers themselves, who would then presumably pass on the administrative cost to the patient).  Here, Nolte agreed in the COA to separate billing."  (*Nolte*, *supra*, 236 Cal.App.4th at p. 1408.)  The court also rejected any claim of fraud for failure to disclose.  "Nolte's allegation that Cedars did not

13

separately and specifically disclose and explain the facilities fee to him is not sufficient to state a claim that the public was likely to be deceived." (*Id.* at p. 1409.)

### 2. *Gray*

*Gray* is the first case that directly addressed the claims at issue here. The plaintiff in Gray received emergency medical care at a Dignity Health hospital, St. Mary's Medical Center (St. Mary's). He alleged violations of the UCL and CLRA and sought declaratory and injunctive relief because St. Mary's did not post signage or verbally tell patients during emergency room registration about an "ER Charge," which, as far as we can tell, is substantially identical to the EMS charge at issue here. (*Gray*, *supra*, 70 Cal.App.5th at pp. 228-229.) The plaintiff did not allege that St. Mary's failed to comply with its statutory duties. Rather, the complaint alleged St. Mary's was required to do more than state and federal law required by disclosing to emergency room patients, prior to providing any treatment, that its billing will include an ER charge. This was the sole factual basis for the plaintiff's complaint. (*Id.* at pp. 234-235.) Relying largely on *Nolte*, the trial court sustained St. Mary's demurrer without leave to amend.

The appellate court affirmed. (*Gray*, *supra*, 70 Cal.App.5th at p. 229.) The court provided a lengthy history of the Payer's Bill of Rights[9] and related federal law. As

---

[9] Moran filed a request for judicial notice of Assembly Bill No. 1045 (2005-2006 Reg.Sess.), introduced February 22, 2005, which proposed adding section 1339.585 to the Payer's Bill of Rights. The stated purpose of this request was disputing the court's interpretation of that history in *Gray*, *supra*, 70 Cal.App.5th at page 231.

Assembly Bill No. 1045 (2005-2006 Reg.Sess.), as initially proposed, stated: "Upon admission of a patient and at the patient's request, the hospital shall provide a written estimate of the hospital's charges for the care that the patient is expected to receive." The enacted version dropped the "upon admission of a patient" language and also explicitly excluded emergency room services. (Stats. 2005, ch. 532, § 3.)

*Gray* stated that the initial version of section 1339.585 included emergency room patients and was later amended to exclude them. (*Gray*, *supra*, 70 Cal.App.5th at p. 231.) Moran contends, without citation to any authority, that "upon admission" does not include admission to an emergency room, and therefore that statement in *Gray* is "wrong."

14

in *Nolte*, the plaintiff in *Gray* did not allege a violation of state or federal statutory duties regarding cost disclosures. "Rather, he claims the hospital is required to do more than is required by the federal and state regulatory schemes, and specifically, is required to disclose to emergency department patients, prior to providing any treatment, that its billing will include an ER Charge (which in the case of St. Mary, is a charge set forth in both its chargemaster and its separate list of the 25 most common outpatient charges filed with the OSHPD)." (*Id.* at p. 234.) The plaintiff alleged the documents he signed upon admission did not disclose the ER charge, nor was the charge "'disclosed on signage posted in or around Defendant's emergency rooms, or verbally during the patients' registration process.'" (*Id.* at p. 235.)

As the basis for his UCL claim, the plaintiff alleged failing to disclose the ER charge was "unfair" and "unlawful" because of the lack of signage or verbal mention of the charge. He also alleged St. Mary's "failure to disclose, prior to providing emergency medical services, that its bill for such service would include an ER Charge is both an 'unfair' and 'unlawful' business practice because the hospital 'bills patients amounts in violation of the [CLRA]' and therefore his UCL 'claim is tethered to a legislatively declared policy.'" (*Gray*, *supra*, 70 Cal.App.5th at p. 237.)

The court rejected the UCL claim, analogizing to *Nolte*, where the court had found that failure to specifically disclose the facility fee was not "unfair" or "fraudulent" within the meaning of the UCL. The court found the factual distinctions in *Nolte* to be immaterial. (*Gray*, *supra*, 70 Cal.App.5th at p. 240.) "Indeed, the circumstances in the instant case are even more compelling than those in *Nolte.* Not only did Dignity fully comply with all state and federal disclosure requirements, including the

We grant the request pursuant to Evidence Code sections 452 and 459 only for the purpose of demonstrating what the original bill stated. We do not take judicial notice of Moran's interpretation of what "admission" to a hospital means, nor do we agree with his interpretation.

requirement that there be signage in its emergency room departments stating how its pricing information can be accessed (§ 1339.51, subds. (a)(1), (c)), but requiring individualized disclosure that the hospital will include an ER Charge in its emergency room billing, prior to providing any emergency medical services, is at odds with the spirit, if not the letter, of the hospital's statutory and regulatory obligations with respect to providing emergency medical care." (*Ibid.*) The "multi[-]faceted statutory and regulatory scheme reflects a strong legislative policy to ensure that emergency medical care is *provided immediately* to those who need it, and that billing disclosure requirements are not to stand in the way of this paramount objective." (*Id.* at p. 241.) The court in *Gray* unreservedly rejected all of the plaintiff's contentions regarding the purported failure to disclose the ER charge as violating with UCL.

With respect to the CLRA claim, the plaintiff relied on Civil Code section 1770, "subdivisions (a)(5) and (a)(14) of the CLRA. Subdivision (a)(5) . . . prohibits '[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have. . . .' Subdivision (a)(14) . . . prohibits '[r]epresenting that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law.'" (*Gray*, *supra*, 70 Cal.App.5th at p. 243.) The court found that the plaintiff had failed to allege a claim under either provision. Subdivision (a)(5) could be based on a failure to disclose, but only where a duty to do so existed, which it did not in the case at bar. (*Id.* at pp. 243-244.) Subdivision (a)(14) generally concerned collateral oral promises, which simply did not apply. (*Id.* at p. 245.)

The plaintiff's equitable claims were entirely derivative of his UCL and CLRA claims, and could not stand on their own. Accordingly, the court affirmed the trial court's decision in its entirety.

16

### 3. Torres

The next case, *Torres*, *supra*, 77 Cal.App.5th at page 504, while reaching many different conclusions from *Gray*, ultimately ended up in the same place – with an affirmance of an order in favor of the defendant hospital. This is another case where the only issue was Hanford Community Hospital's (Hanford) failure to disclose an EMS fee. The operative complaint alleged this fee was not mentioned in the contract the plaintiff signed, posted in the emergency room, or verbally disclosed to her. (*Id.* at p. 506.) The operative complaint alleged Hanford "knows of the following separate but related facts: (1) an EMS Fee exists, (2) the events that trigger Hospital's imposition of an EMS Fee, (3) the EMS Fee has 5 levels, (4) Hospital uses an internal formula to determine which of the five levels of EMS Fees is imposed on a particular patient, and (5) each level of EMS Fee is assigned a specific amount and, as a result, the determination of the level of the fee effectively determines its amount." (*Id.* at pp. 510-511.) The plaintiff did not allege a violation of the statutory schemes regarding disclosure and price transparency, including the Payer's Bill of Rights. (*Id.* at p. 510.) Rather, she alleged that the description of the EMS fee in the chargemaster was not adequate. (*Ibid.*)

The plaintiff sued under the UCL and CLRA and requested declaratory relief. Hanford moved for judgment on the pleadings, which was ultimately granted without leave to amend. (*Torres*, *supra*, 77 Cal.App.5th at pp. 506-507.) The precise amount of an EMS fee, the trial court determined, could not be ascertained until after a patient is evaluated. Accordingly, under section 1339.585, which specifically exempts emergency treatment, hospitals were not required to provide a cost estimate in the emergency room. (*Torres*, at pp. 509-510.)

The appellate court began its analysis with the CLRA, noting that the plaintiff had alleged violations of Civil Code section 1770, subdivision (a)(5) and (14), the same provisions at issue in *Gray*. (*Torres*, *supra*, 77 Cal.App.5th at pp. 508-510.) The court noted that subdivision (a)(5) was triggered when there was a duty to disclose,

17

including situations where "'the defendant has exclusive knowledge of material facts not known or reasonably accessible to the plaintiff' . . . [or] the defendant actively conceals a material fact . . . ." (*Id.* at p. 509.)

In its discussion of the issue of failure to disclose, the court acknowledged *Nolte* and *Gray*, and stated that its conclusions did not contradict those cases. (*Torres*, *supra*, 77 Cal.App.5th at p. 513.) Yet the court focused its analysis primarily on whether the EMS fees were "reasonably accessible" to the plaintiff. (*Id.* at pp. 510-513.) Rather than focusing on compliance with the extensive state and federal laws on the subject, the court stated the relevant analysis was whether the plaintiff had "reasonable access" to the EMS fees under a reasonable person standard. (*Id.* at p. 511.)

Hanford argued that compliance with statutory requirements regarding the accessibility of the chargemaster meant that the plaintiff had reasonable access to the material facts as a matter of law. (*Torres*, *supra*, 77 Cal.App.5th at p. 512.) But the court noted the operative complaint alleged the chargemaster was "'unusable and effectively worthless for the purpose of providing pricing information to consumers'; the chargemaster failed to include the standardized . . . codes recognized in the industry; and the chargemaster used coding and highly abbreviated descriptions that are meaningless to consumers. Accordingly, the SAC further alleges that the chargemaster was meaningless for purposes of pricing transparency. In effect, [the plaintiff] contends these allegations are sufficient to allege the material facts were not *reasonably* accessible and the factual question of reasonable access cannot be resolved at the pleading stage." (*Ibid.*)

The court agreed with the plaintiff, finding that based on the operative complaint's allegations, she had "stated facts sufficient to plead a lack of reasonable access to (1) the facts that trigger [Hanford's] imposition of an EMS Fee and (2) the formula used to determine which level of EMS Fee to impose on an emergency room patient. In short, we cannot conclude as a matter of law that an objectively reasonable person who reviewed [Hanford's] chargemaster and its form of 25 common outpatient

18

procedures could discern the circumstances in which the EMS Fee is charged or how the amount of the EMS Fee is determined." (*Torres*, *supra*, 77 Cal.App.5th at pp. 512-513.)

The court noted, however, that this was not the end of the analysis. Failure to disclose under the CLRA must involve material facts: "'a fact is "material" if a reasonable consumer would deem it important in determining how to act in the transaction at issue.'" (*Torres*, *supra*, 77 Cal.App.5th at p. 513.) Materiality is closely related to causation, and "[a] causal link between the deceptive practice and damage to the plaintiff is a necessary element of a CLRA cause of action." (*Ibid.*) "A misrepresentation or an omission of fact is material only if the plaintiff relied on it—that is, the plaintiff would not have acted as he or she did without the misrepresentation or the omission of fact." (*Ibid.*) The court determined that the operative complaint did not properly plead reliance under the CLRA, and further, taken as a whole, it was not reasonable to infer that the plaintiff would have acted differently had she known of the alleged material facts. (*Torres*, at p. 514.) The EMS fee the plaintiff was charged was for the highest level of severity. "Therefore, without more particular facts alleged, it is reasonable to infer that [the plaintiff] suffered severe injuries that posed a significant threat based on these facts. In turn, it is not reasonable to infer [the plaintiff] would have obtained treatment elsewhere if the facts about the existence, imposition and amount of the EMS Fee had been disclosed." (*Ibid.*)

With respect to active concealment, the court concluded the plaintiff had failed to plead with the required particularity or to sufficiently plead reliance. (*Torres*, *supra*, 77 Cal.App.5th at p. 514.) Accordingly, the court affirmed the trial court's decision to grant judgment on the pleadings.

### 4. *Saini*

The appeal in *Saini*, like *Torres* and *Gray*, was almost entirely about the viability of a claim for the alleged failure to disclose an EMS fee. By the time the case

reached the appellate court, the UCL and declaratory relief claims had been eliminated, leaving a single cause of action under the now-familiar Civil Code section 1770, subdivision (a)(5) and (14) of the CLRA. The complaint's allegations were very similar to those at issue here. (*Saini*, *supra*, 80 Cal.App.5th at pp. 1056-1059.) The trial court sustained Sutter Health's demurrer without leave to amend, "concluding that defendant has no duty to post notice of the EMS Fee in its emergency room. The trial court ruled that the allegations of the complaint show that defendant has complied with its statutory disclosure obligations and that there is no duty to make an additional disclosure of the EMS Fee in light of the public policy reflected in federal and state statutes that emergency room care be provided to patients without delay or questioning about their ability to pay." (*Id.* at p. 1059.)

The appellate court affirmed, rejecting the plaintiff's arguments that *Gray* was wrongly decided.[10] (*Saini*, *supra*, 80 Cal.App.5th at pp. 1056-1057.) "We agree [with *Gray* that] defendant does not have a duty under the CLRA to disclose the EMS Fee by posting additional signage in its emergency rooms. As plaintiff's complaint acknowledges, the EMS Fee is disclosed in the hospital's chargemaster in compliance with state and federal law. Making the unsupported assumption that this disclosure is insufficient and does not in fact convey the necessary information to one seeking this information before receiving emergency room treatment, there nonetheless is no basis to require further disclosure." (*Id.* at p. 1061.)

The plaintiff argued a duty to disclose based on the "'exclusive knowledge'" and "'intentional concealment'" prongs of the CLRA. (*Saini*, *supra*, 80 Cal.App.5th at p. 1061.) The court stated: "The hospital has a duty under the CLRA, as well as the many statutes cited above [including the Payer's Bill of Rights], to disclose the fees it intends to charge for its goods and services, including the EMS Fee. It does so

---

[10] *Gray* was decided by the First Appellate District, Division One, and *Saini* was decided by the First Appellate District, Division Four.

in its chargemaster, to which signage in the emergency room directs those interested. The question here, however, is whether defendant has a duty to call attention to the EMS Fee by additional signage in the emergency room visible to a person seeking emergency care. The *Gray* court concluded that for the reasons it explained no such duty exists, and we agree." (*Id.* at p. 1062, fn.omitted.) The court further noted that the *Gray* court "carefully considered the competing interests served by ensuring that patients are fully apprised in advance of the costs of emergency services and ensuring that patients have timely access to emergency services." (*Ibid.*) "[A]s *Gray* makes clear, the state and federal legislative bodies are in a superior position to balance these competing interests and have done so in crafting the applicable 'multifaceted statutory and regulatory scheme.' [Citation.] Our conclusion is consistent with the balance struck by the existing regulatory scheme and does not, as plaintiff suggests, disregard the 'important policy in favor of providing pricing transparency to medical patients.'" (*Id.* at p. 1063.)

The court also distinguished *Torres*, stating that unlike the complaint in *Torres*, "plaintiff's complaint expressly disavows any claim that 'defendant fails to list an EMS Fee as a line item in its published chargemasters, or that defendant fails to list the price of such fees in its chargemasters.'" (*Saini*, *supra*, 80 Cal.App.5th at p. 1062, fn. 8.) Rejecting the remainder of the plaintiff's arguments, the court affirmed the trial court's ruling sustaining the demurrer without leave to amend. (*Id.* at pp. 1063-1066.)

### 5. *Naranjo*

After briefing in this case was completed, the Fifth Appellate District decided *Naranjo*, *supra*, 90 Cal.App.5th 1193, and as we mentioned above, shortly after

21

oral argument, the California Supreme Court granted review.[11]  Again, *Naranjo* case was about the propriety of an EMS fee under the UCL and CLRA.  The plaintiff's complaint alleged "he was never warned or notified" in the conditions of admission or by "'signage in the emergency room'" that he would be charged an EMS fee.  (*Naranjo*, at p. 1198.)

Following *Torres,* also decided by the Fifth Appellate District, and the line of cases cited therein, primarily regarding the duty to disclose known facts, the *Naranjo* court determined the plaintiff had adequately stated claims under the UCL and CLRA.

In sum, *Naranjo*, *supra*, 90 Cal.App.5th at page 1193, is the only case which allowed this type of case to proceed on the merits.  While *Torres* tacitly rejected the proposition that the relevant state and federal statutes are the only source of a hospital's duty to disclose an EMS fee, the court found no reliance under the CLRA. (*Torres*, *supra*, 77 Cal.App.5th at pp. 512-514.)  Both *Gray* and *Saini* held that hospitals have no duty to disclose beyond the requirements of the state and federal regulatory schemes.  (*Saini*, *supra*, 80 Cal.App.5th at pp. 1061-1062; *Gray*, *supra*, 70 Cal.App.5th at pp. 241-243.)

### E.  *"Implied" Safe Harbor*

Moran contends the trial court "effectively" found an "implied safe harbor" for defendants.  As we noted in *Moran*, *supra*, 3 Cal.App.5th at page 1140, "'[w]hen specific legislation provides a "safe harbor," plaintiffs may not use the general unfair competition law to assault that harbor.'"  (See *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 182.)  We do not find the trial court's order wrongfully "implied" a safe harbor.  It simply found that no duty existed to

---

[11] The same day the California Supreme Court granted review in *Naranjo*, it also granted review in *Capito v. San Jose Healthcare System* (Apr. 6, 2023, H049646) [nonpub. opn.], review granted July 26, 2023, S280018, S279862.  In that case, the Sixth Appellate District affirmed the trial court's dismissal of the case, rejecting *Torres* and following *Gray* and *Saini*.

post Moran's requested signage.  (See *Saini*, *supra*, 80 Cal.App.5th at p. 1065; *Gray, supra,* 70 Cal.App.5th at p. 241.)

*F.  UCL Allegations Based on EMS Fee*

The UCL's purpose is "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition, by prohibiting unfair, dishonest, deceptive, destructive, fraudulent and discriminatory practices by which fair and honest competition is destroyed or prevented."  (Bus. & Prof. Code, § 17001.)  The law prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."  (Bus. & Prof. Code, §§ 17200, 17203, 17204.)

An "unlawful" act or practice is "'''"anything that can properly be called a business practice and that at the same time is forbidden by law."'''"  (*Cel-Tech*, *supra*, 20 Cal.4th at p. 180; see *Moran*, *supra*, 3 Cal.App.5th at p. 1140.)  As interpreted by this district, "unfair" is defined as stated in *Gregory v. Albertson's, Inc.* (2002) 104 Cal.App.4th 845, 854:  "[W]here a claim of an unfair act or practice is predicated on public policy, . . . the public policy which is a predicate to the action must be 'tethered' to specific constitutional, statutory or regulatory provisions."  (See *Graham v. Bank of America, N.A.* (2014) 226 Cal.App.4th 594, 613.)  A "fraudulent" act or practice is one likely to deceive the public.  (*Shaeffer v. Califia Farms, LLC* (2020) 44 Cal.App.5th 1125, 1135.)

Pursuant to the complaint and as relevant to this appeal, the following acts by the Hospital allegedly violated the UCL:  "unfairly and unlawfully charg[ing] their emergency patients an EMS Fee and fail[ing] to inform and/or conceal[ing] from their patients their uniform policy of billing a substantial, unreasonable, and undisclosed EMS Fee in addition to the charges for individual items of treatment or services provided to the patient."  The complaint further alleged:  "Knowledge of such an EMS Fee would be a

23

substantial factor in a patient's decision as to whether to remain at the hospital and proceed with treatment."

The legislatively declared policy that makes this practice unfair, the complaint claimed, is the violation of the CLRA. The complaint does *not* allege that the Hospital violated the UCL by failing to list the EMS fee in the published chargemaster, and Moran conceded that the Hospital filed its chargemaster with the OSHPD and posted it on its own web site as of the date the complaint was filed.[12]

As discussed above, as well as in *Gray* and *Saini*, the California Legislature, the United States Congress, and numerous rulemaking bodies have already decided what pricing information to make available in a hospital's emergency room. Just as importantly, they have decided what *not* to include in those requirements. The reason for this extensive statutory and regulatory scheme is to strike a balance between price transparency and dissuading patients from avoiding potentially life-saving care due to cost. (See, e.g., §§ 1339.51, subd. (a)(1), 1339.585 [exemption to requirement of written estimates for emergency patients]; 42 U.S.C. § 1395dd(a), (h) [prohibiting delay of treatment to inquire about ability to pay]; 26 C.F.R. § 1.501(r)–4(c)(2) [prohibiting actions that discourage individuals from seeking emergency care]; 84 Fed.Reg. 65524, 65536 (Nov. 27, 2019) [price transparency provisions of Affordable Care Act do not require hospitals to post signage about cost of care].)

While "conduct not expressly prohibited by statute may nevertheless be found to be an 'unfair' business practice under the UCL [citation], the alleged conduct must nevertheless meet the substantive definition of an 'unfair' practice to be actionable,

---

[12] Moran claims the trial court improperly found that the Hospital complied with various provisions of the Payers' Bill of Rights. What is relevant here is whether Moran properly *alleged a violation* of the Payers' Bill of Rights, which he did not. The complaint disavowed alleging a violation of the relevant provisions of the Payers' Bill of Rights that deal with disclosing hospital prices and fees.

which the failure to disclose Gray complains of here, does not . . . ." (*Gray*, *supra*, 70 Cal.App.5th at p. 242.)

Given that both the state and federal governments have thoroughly considered patients' need for price transparency about hospital charges, we find that as a matter of law, in accord with *Gray* and *Saini*, the Hospital's policy of not providing additional signage or other warnings about the EMS fee does not state a claim for unfair, unlawful, or fraudulent conduct within the UCL. "[R]equiring individualized disclosure that the hospital will include an ER Charge in its emergency room billing, prior to providing any emergency medical services, is at odds with the spirit, if not the letter, of the hospital's statutory and regulatory obligations with respect to providing emergency medical care." (*Gray*, *supra*, 70 Cal.App.5th at p. 240; see *Saini*, *supra*, 80 Cal.App.5th at p. 1060.) [13] A hospital's duty to list, post, write down, or discuss fees it may or may not charge an emergency room patient starts and ends with its duty to list prices in the chargemaster, which must be available in accordance with state law. (See *Id*. at p. 1062.)

To the extent that *Torres* and *Naranjo* hold otherwise, we decline to follow them. Further, we note that the chargemaster in *Torres* was allegedly "'unusable and effectively worthless for the purpose of providing pricing information to consumers,'" and "failed to include the standardized CPT codes recognized in the industry." (*Torres*, *supra*, 77 Cal.App.5th at p. 512.) Such allegations are not present here. Unlike in *Torres*, the Contract Moran signed expressly referred the patient to the chargemaster for a description of fees, which, as our prior opinion stated, "provided a means by which a patient can ascertain the amount due for the treatment and services reasonably provided." (*Moran*, *supra*, 3 Cal.App.5th at p. 1147.) The Hospital's chargemaster listed CPT codes and described the 25 most common procedures, including EMS fees for levels two

---

[13] The fact that Moran claims that he seeks additional disclosures through the written Contract that were not at issue in *Gray* is a distinction without a difference. The EMS fee was included in the chargemaster, as required by law.

through four, in plain English. The allegations regarding the EMS fee were properly stricken from the UCL cause of action.

### G. CLRA Claims Based on EMS Fee

As relevant to this appeal, the alleged portions of the CLRA Moran claims the hospital violated were Civil Code section 1170, subdivision (a)(5) and (14) – the same provisions at issue in *Saini*, *supra*, 80 Cal.App.5th at page 1061, and *Gray*, *supra*, 70 Cal.App.5th at page 243. Subdivision (a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have . . . ." Subdivision (a)(14) prohibits "[r]epresenting that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law."

Under the CLRA, the failure to disclose is limited to a few narrow factual situations. Here, Moran argues the Hospital had "exclusive knowledge" and "intentionally conceal[ed]" the EMS fee. The court in *Saini*, which faced the same arguments, rejected the allegations. "[T]here is no withholding of information that is provided on the hospital's chargemaster." (*Saini*, *supra,* 80 Cal.App.5th at p. 1062.)

We reject Moran's contention that *Gray* and *Saini* were wrongly decided. To the extent that Moran would have us reject those cases and rely on *Torres*, as we discussed above, that case does not help him when it comes to the issue of reliance, another essential element of a CLRA cause of action. As defendants point out, earlier versions of Moran's complaint undercut his claim that he "relied on not being billed" an EMS fee. Allegations in earlier complaints continue to bind plaintiff even if the allegation is omitted from subsequent versions. (*Panterra GP, Inc. v. Superior Court* (2022) 74 Cal.App.5th 697, 711.) To the extent Moran relies entirely on *Naranjo*, we disagree and decline to follow it.

In his initial complaint, Moran alleged that "patients such as Plaintiff, who

26

experienced a medical emergency, have no opportunity to shop for prices or negotiate fixed pricing terms in advance."  In the fifth amended complaint, he alleged that "in an emergency care situation," it is "impossible to look up, compare, or negotiate fixed pricing amounts or payment terms in advance of receiving emergency treatment/services."

Further, Moran's history at each of his three visits suggest serious and legitimate medical emergencies where he would have had no realistic opportunity to compare prices or consider leaving.  At each visit, he was charged a level four EMS fee, the second highest, indicating a "high severity" emergency.  He received CT scans at his first and third visits.  None of these facts suggest a reasonable inference that disclosing the EMS fees would have resulted in Moran seeking treatment elsewhere,[14] which would doom his allegations if we relied on *Torres.*  (*Torres*, *supra*, 77 Cal.App.5th at pp. 513-514.)

Accordingly, for the same reasons that *Gray* and *Saini* articulate so well, we find no duty to disclose the EMS fee under the CLRA beyond those imposed by existing state and federal laws and regulations.  But even if we were to disagree and find such a duty, Moran failed to adequately plead reliance.  The trial court, therefore, properly struck those allegations from the complaint.

### H.  The Declaratory Relief Claims based on the EMS Fee

Moran's declaratory relief claim with respect to the EMS fee, like his UCL and CLRA claims, relies entirely on the idea that the Hospital was required to take steps beyond what is required by state law to inform him of those fees.  We disagree.  As the

---

[14] Moran, in support of class certification, submitted a declaration stating otherwise. Because the declaration is outside the pleadings and the facts stated therein are not subject to judicial notice, the declaration must be disregarded in the context of a demurrer or motion to strike.  (See *Mt. Hawley Ins. Co. v. Lopez* (2013) 215 Cal.App.4th 1385, 1426.)

court noted in *Gray*, *supra*, 70 Cal.App.5th at page 245, the claim for declaratory relief "has no independent vitality apart from his UCL and CLRA claims. Rather, it is a request for particular forms of equitable relief. [Citation.] Since his UCL and CLRA claims fail, so too does his request for declaratory . . . relief." The parts of the declaratory relief action referring to the EMS fee were properly stricken from the complaint.

*I. Moran's Claimed "Errors" in the Trial Court's Ruling*

Despite the fact that our review is de novo and the fact that "we review [the trial court's] ruling, not its reasoning" (*Qualcomm, Inc. v. Certain Underwriters at Lloyd's, London* (2008) 161 Cal.App.4th 184, 204), Moran has chosen to organize the much of the argument section of his opening brief by picking apart alleged "errors" made by the trial court.[15] This is unhelpful as an organizational principle in the instant procedural context, and most of the points raised are either irrelevant or subsumed by our prior discussion. None of the contentions Moran raises about the trial court's purportedly faulty order constitute reversible error.

---

[15] For example, Moran claims the trial court relied extensively on *Nolte*, which is "nothing like this case" (boldfacing & capitalization omitted), and did not "acknowledge the overwhelming factual differences between [*Nolte* and *Gray*]." The trial court's job is to reach the correct ruling, which it did. It does not matter which cases it relied on too little or too much if it reached the right decision. Relying on the "wrong" case while reaching the right answer is not reversible error.

## III

## DISPOSITION

Moran's request for judicial notice is granted.  The court's order striking certain portions of the complaint is affirmed.  Defendants are entitled to their costs on appeal.


MOORE, J.

WE CONCUR:


O'LEARY, P. J.


BEDSWORTH, J.